IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| RODNEY ALVERSON, #132431, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. 2:18-CV-61-MHT |
| | ) | (WO) |
| | ) | |
| LORENZO MILLS, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## RECOMMENDATION OF THE MAGISTRATE JUDGE

## I. INTRODUCTION[1]

This 42 U.S.C. § 1983 action is before the court on a complaint, Doc. 1, and amendment thereto, Doc. 11, filed by Rodney Alverson, an indigent state inmate and frequent federal litigant, for alleged constitutional violations primarily arising when correctional officials transferred him from Draper Correctional Facility to Easterling Correctional Facility in January of 2018 at the time of Draper's impending closure. Alverson names Lorenzo Mills, a correctional officer at Draper, Mary Cook, a warden at Draper, Amy Davenport, a classification specialist, Cassandra Conway, the Director of Classification, Angie Baggett, the Assistant Director of Classification, Jefferson S. Dunn, the Commissioner of the Alabama Department of Corrections, Brittany Bates, a classification supervisor, and Edward Ellington, the Northern Region Institutional

---

[1] All document numbers and attendant page numbers cited herein are those assigned by the Clerk of this court in the docketing process.

Coordinator for the Alabama Department of Corrections, as defendants.  Alverson seeks relief from the defendants in both their individual and official capacities.  Doc. 1 at 3.

In the instant civil action, Alverson complains that the defendants transferred him from Draper to Easterling in January of 2018 in retaliation for filing previous lawsuits rather than assigning him to Staton and permitting him to work at the furniture plant.  Doc. 1 at 7–8.  He also alleges, generally, that his transfer to Easterling violated his due process and equal protection rights.  In an amendment to the complaint, Doc. 11, the court permitted Alverson to add Brittany Bates and Edward Ellington as defendants and raise a conspiracy claim against all of the defendants.  Doc. 12.  Alverson seeks a declaratory judgment, injunctive relief and monetary damages for the alleged violations of his constitutional rights.  Doc. 1 at 4.

The defendants filed a special report, supplemental special reports, relevant evidentiary materials in support of their reports, including affidavits and certified copies of pertinent prison records, show cause responses and responses to discovery requests addressing the claims raised by Alverson.  In these documents, the defendants adamantly deny they acted in violation of Alverson's constitutional rights in making decisions on his institutional placement or employment assignment.  Specifically, the defendants maintain responsible officials based any transfer decision on various constitutionally permitted screening criteria such as the inmate's classification level, medical codes, mental health codes, enemy verification and available bed space at the potential transferee facilities and further maintain the decision to transfer Alverson to Easterling in January of 2018 occurred due to the imminent closure of Draper and implementation of the foregoing factors.

After reviewing the initial special report filed by the defendants, the court issued an order on May 1, 2018 directing Alverson to file a response to each of the arguments set forth by the defendants in their reports and advising him that his response should be supported by affidavits or statements made under penalty of perjury and other appropriate evidentiary materials. Doc. 37 at 2. This order specifically cautioned that "**unless within fifteen (15) days from the date of this order a party . . . presents sufficient legal cause why such action should not be undertaken** . . . the court may at any time [after expiration of the time for the plaintiff filing a response to this order] and **without further notice to the parties** (1) treat the special report and any supporting evidentiary materials as a motion for summary judgment and (2) after considering any response as allowed by this order, rule on the motion for summary judgment in accordance with the law." Doc. 37 at 3. Alverson filed a response with supporting materials, including affidavits, to this order on Nov. 1, 2018. Docs. 67 & 67-1 thru 67-5. Upon receipt of a supplemental special report from the defendants on March 11, 2020, Doc. 78, the court ordered an additional supplement to the special report from the defendants, Doc. 79, which they filed on April 22, 2020, Doc. 85. The court provided Alverson an opportunity to file any additional response he deemed necessary to the supplemental special reports and advised him that in doing so he "should comply with the directives of the order entered on May 1, 2018 (Doc. 37)[.]" Doc. 79. Alverson filed no response addressing the supplemental special reports.

Pursuant to the directives of the above described orders, the court now treats the defendants' special report and supplements to the report as a motion for summary judgment. Upon consideration of the defendants' motion for summary judgment, the

evidentiary materials filed in support thereof, the sworn complaint and response filed by Alverson, the court concludes that summary judgment is due to be granted in favor of the defendants.

## II.  SUMMARY JUDGMENT STANDARD

"Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine [dispute] as to any material fact and that the moving party is entitled to judgment as a matter of law." *Greenberg v. BellSouth Telecomm., Inc.*, 498 F.3d 1258, 1263 (11th Cir. 2007) (internal quotation marks omitted); Rule 56(a), Fed.R.Civ.P. ("The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.").  The party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the [record, including pleadings, discovery materials and affidavits or properly sworn statements], which it believes demonstrate the absence of a genuine [dispute] of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Jeffery v. Sarasota White Sox, Inc.*, 64 F.3d 590, 593 (11th Cir. 1995) (holding that moving party has initial burden of showing there is no genuine dispute of material fact for trial).  The movant may meet this burden by presenting evidence indicating there is no dispute of material fact or by showing that the nonmoving party has failed to present appropriate evidence in support of some element of its case on which it bears the ultimate burden of proof.  *Celotex*, 477 U.S. at 322–24; *Moton v. Cowart*, 631 F.3d 1337, 1341 (11th Cir. 2011) (holding that moving party discharges his burden by

showing the record lacks evidence to support the nonmoving party's case or the nonmoving party would be unable to prove his case at trial).

When the defendants meet their evidentiary burden, as they have in this case, the burden shifts to the plaintiff to establish, with appropriate evidence, that a genuine dispute material to his case exists. *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *Celotex*, 477 U.S. at 324; Fed.R.Civ.P. 56(e)(3) ("If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact [by citing to materials in the record including affidavits, sworn statements, relevant documents or other materials], the court may . . . grant summary judgment if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it[.]"); *Jeffery*, 64 F.3d at 593–94 (holding that, once a moving party meets its burden, "the non-moving party must then go beyond the pleadings, and by its own affidavits [or statements made under penalty of perjury], or by depositions, answers to interrogatories, and admissions on file," demonstrate that there is a genuine dispute of material fact). In civil actions filed by inmates, federal courts "must distinguish between evidence of disputed facts and disputed matters of professional judgment. In respect to the latter, our inferences must accord deference to the views of prison authorities. Unless a prisoner can point to sufficient evidence regarding such issues of judgment to allow him to prevail on the merits, he cannot prevail at the summary judgment stage." *Beard v. Banks*, 548 U.S. 521, 530 (2006) (internal citation omitted). This court will also consider "specific facts" pled in a plaintiff's sworn complaint when considering his opposition to summary judgment. *Caldwell v. Warden, FCI Talladega*, 748 F.3d 1090, 1098 (11th Cir. 2014);

*Barker v. Norman*, 651 F.2d 1107, 1115 (5th Cir. Unit A 1981) (stating that a verified complaint serves the same purpose as an affidavit for purposes of summary judgment). However, "mere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion." *Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005).

A genuine dispute of material fact exists when the nonmoving party produces evidence that would allow a reasonable fact-finder to return a verdict in its favor such that summary judgment is not warranted. *Greenberg*, 498 F.3d at 1263; *Allen v. Bd. of Pub. Educ. for Bibb Cnty.*, 495 F.3d 1306, 1313 (11th Cir. 2007). The evidence must be admissible at trial, and if the nonmoving party's evidence "is merely colorable . . . or is not significantly probative . . . summary judgment may be granted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50 (1986); *see also* Fed.R.Civ.P. 56(e). "A mere 'scintilla' of evidence supporting the opposing party's position will not suffice[.]" *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990) (citing *Anderson*, 477 U.S. at 252). Only disputes involving material facts are relevant and materiality is determined by the substantive law applicable to the case. *Anderson*, 477 U.S. at 248.

To demonstrate a genuine dispute of material fact, the party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts. . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine [dispute] for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."

*Anderson*, 477 U.S. at 255.  At the summary judgment stage, this court should accept as true "statements in [the plaintiff's] verified complaint, [any] sworn response to the [defendants'] motion for summary judgment, and sworn affidavit attached to that response[.]" *Sears v. Roberts*, 922 F.3d 1199, 1206 (11th Cir. 2019); *United States v. Stein*, 881 F.3d 853, 857 (11th Cir. 2018) (holding that a plaintiff's purely self-serving and uncorroborated statements "based on personal knowledge or observation" set forth in a verified complaint or affidavit may create an issue of material fact which precludes summary judgment); *Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1253 (11th Cir. 2013) (citations omitted) ("To be sure, [Plaintiff's] sworn statements are self-serving, but that alone does not permit [the court] to disregard them at the summary judgment stage . . . . Courts routinely and properly deny summary judgment on the basis of a party's sworn testimony even though it is self-serving.").  However, general, blatantly contradicted and merely "[c]onclusory, uncorroborated allegations by a plaintiff in [his verified complaint or] an affidavit . . . will not create an issue of fact for trial sufficient to defeat a well-supported summary judgment motion."  *Solliday v. Fed. Officers*, 413 F. App'x 206, 207 (11th Cir. 2011) (*citing Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1081 (11th Cir. 1990).  In addition, conclusory allegations based on purely subjective beliefs of a plaintiff and assertions of which he lacks personal knowledge are likewise insufficient to create a genuine dispute of material fact.  *See Holifield v. Reno*, 115 F.3d 1555, 1564 n.6 (11th Cir. 1997).  In cases where the evidence before the court which is admissible on its face or which can be reduced to admissible form indicates there is no genuine dispute of material fact and the party moving for summary judgment is entitled to it as a matter of law,

summary judgment is proper. *Celotex*, 477 U.S. at 323–24; *Waddell v. Valley Forge Dental Associates, Inc.*, 276 F.3d 1275, 1279 (11th Cir. 2001) (holding that to establish a genuine dispute of material fact the nonmoving party must produce evidence such that a reasonable trier of fact could return a verdict in his favor). "The mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is material to an issue affecting the outcome of the case." *McCormick v. City of Fort Lauderdale*, 333 F.3d 1234, 1243 (11th Cir. 2003) (citation omitted). "[T]here must exist a conflict in substantial evidence to pose a jury question." *Hall v. Sunjoy Indus. Group, Inc.*, 764 F. Supp. 2d 1297, 1301 (M.D. Fla. 2011) (citation omitted). "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

Although factual inferences must be viewed in a light most favorable to a plaintiff and *pro se* complaints are entitled to liberal interpretation, a *pro se* litigant does not escape the burden of establishing by sufficient evidence a genuine dispute of material fact. *See Beard*, 548 U.S. at 525. Thus, a plaintiff's *pro se* status alone does not compel this court to disregard elementary principles of production and proof in a civil case. Here, after a thorough and exhaustive review of all the evidence which would be admissible at trial, the undersigned finds that Alverson has failed to demonstrate a genuine dispute of material fact in order to preclude entry of summary judgment in favor of the defendants. *See Matsushita*, 475 U.S. at 587.

## III.  DISCUSSION

### A.  Sovereign Immunity

The defendants argue, Doc. 34 at 12, and the court agrees that to the extent Alverson lodges claims against them in their official capacities and seeks monetary damages the defendants are entitled to sovereign immunity.   Official capacity lawsuits are "in all respects other than name, . . . treated as a suit against the entity."  *Kentucky v. Graham*, 473 U. S. 159, 166 (1985).

> "[T]he Eleventh Amendment prohibits federal courts from entertaining suits by private parties against States and their agencies [or employees]." *Alabama v. Pugh*, 438 U.S. 781, 781, 98 S.Ct. 3057, 57 L.Ed.2d 1114 (1978).  There are two exceptions to this prohibition: where the state has waived its immunity or where Congress has abrogated that immunity. *Virginia Office for Prot. & Advocacy v. Stewart*, 563 U.S. 247, 131 S.Ct. 1632, 1637–38, 179 L.Ed.2d 675 (2011). "A State's consent to suit must be 'unequivocally expressed' in the text of [a] relevant statute." *Sossamon v. Texas*, 563 U.S. 277, 131 S.Ct. 1651, 1658, 179 L.Ed.2d 700 (2011) (quoting *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 98, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984)). "Waiver may not be implied." *Id.*  Likewise, "Congress' intent to abrogate the States' immunity from suit must be obvious from 'a clear legislative statement.'" *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 55, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996) (quoting *Blatchford v. Native Vill. of Noatak*, 501 U.S. 775, 786, 111 S.Ct. 2578, 115 L.Ed.2d 686 (1991)).

*Selensky v. Alabama*, 619 F. App'x 846, 848–49 (11th Cir. 2015).  Thus, a state official may not be sued in his official capacity for damages unless the state has waived its Eleventh Amendment immunity, *see Pennhurst State School & Hospital v. Halderman*, 465 U.S. 89, 100 (1984), or Congress has abrogated the State's immunity, *see Seminole Tribe v. Florida*, 517 U.S. 44, 59 (1996).

> Neither waiver nor abrogation applies here. The Alabama Constitution states that "the State of Alabama shall never be made a defendant in any court of law or equity." Ala. Const. art. I, § 14.  The Supreme Court has recognized

that this prohibits Alabama from waiving its immunity from suit.  *Pugh,* 438
U.S. at 782, 98 S.Ct. 3057 (citing Ala. Const. art. I, § 14.)

*Selensky*, 619 F. App'x at 849.  "Alabama has not waived its Eleventh Amendment

immunity in § 1983 cases, nor has Congress abated it."  *Holmes v. Hale*, 701 F. App'x 751,

753 (11th Cir. 2017) (citing *Carr v. City of Florence*, Ala., 916 F.2d 1521, 1525 (11th Cir.

1990)).  In light of the foregoing, the defendants are entitled to sovereign immunity under

the Eleventh Amendment from the request for monetary damages from them in their

official capacities.  *Selensky*, 619 F. App'x at 849; *Harbert Int'l, Inc. v. James*, 157 F.3d

1271, 1277 (11th Cir. 1998) (holding that state officials sued in their official capacities are

protected from suit for damages under the Eleventh Amendment); *Edwards v. Wallace

Community College*, 49 F.3d 1517, 1524 (11th Cir. 1995) (holding that damages are

unavailable from state official sued in his official capacity).

## B.  Qualified Immunity

The defendants raise the defense of qualified immunity to the claims lodged against

them in their individual capacities. Doc. 34 at 12–18.  "The defense of qualified immunity

completely protects government officials performing discretionary functions from suit [for

damages] in their individual capacities unless their conduct violates 'clearly established

statutory or constitutional rights of which a reasonable person would have known.'"

*Gonzalez v. Reno*, 325 F.3d 1228, 1233 (11th Cir.2003) (quoting *Hope v. Pelzer*, 536 U.S.

730, 739 (2002)). "The purpose of the qualified immunity defense is to protect[]

government officials from liability for civil damages insofar as their conduct does not

violate clearly established statutory or constitutional rights of which a reasonable person

would have known." *Youmans v. Gagnon*, 626 F.3d 557, 562 (11th Cir. 2010) (internal quotations and citations omitted). "Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments, and protects all but the plainly incompetent or those who knowingly violate the law." *Messerschmidt v. Millender*, 565 U.S. 535, 546 (2012) (citations and quotation marks omitted). "Unless a government agent's act is so obviously wrong, in light of the pre-existing law, that only a plainly incompetent officer or one who was knowingly violating the law would have done such a thing, the government actor is immune from suit." *Lassiter v. Ala. A&M University Bd. of Trustees*, 28 F.3d 1146, 1149 (11th Cir. 1994). The Eleventh Circuit has determined that the law is "clearly established" for purposes of qualified immunity "only by decisions of the U. S. Supreme Court, Eleventh Circuit Court of Appeals, or the highest court of the state where the case arose." *Jenkins v. Talladega City Bd. of Education*, 115 F.3d 821, 826-827 n.4 (11th Cir. 1997). The Supreme Court "repeatedly ha[s] stressed the importance of resolving immunity questions at the earliest possible stage in litigation." *Pearson v. Callahan*, 555 U.S. 223, 231–32 (2009). Even so, qualified immunity is only an affirmative defense to an action for damages; it does not bar actions for declaratory or injunctive relief. *See Wood v. Strickland*, 420 U.S. 308, 315, n.6 (1975) ("Immunity from damages does not ordinarily bar equitable relief as well."), *overruled in part on other grounds by Harlow*, 457 U.S. 800; *American Fire, Theft & Collision Managers, Inc. v. Gillespie*, 932 F.2d 816, 818 (9th Cir. 1991) (holding that the defense of qualified immunity is limited to actions for monetary damages and does not serve as a defense to actions seeking equitable relief).

"To receive qualified immunity, the government official must first prove that he was acting within his discretionary authority." *Gonzalez*, 325 F.3d at 1234.  It is clear to the court that the defendants here were acting "within the scope of [their] discretionary authority," so "the burden shifts to [Alverson] to show that qualified immunity is not appropriate." *Id.*; *see also Townsend v. Jefferson Cnty.*, 601 F.3d 1152, 1158 (11th Cir. 2010).  To meet this burden, Alverson must prove both that "(1) the defendants violated a constitutional right, and (2) this right was clearly established at the time of the alleged violation." *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1264 (11th Cir.2004); *Crosby v. Monroe Cnty.*, 394 F.3d 1328, 1332 (11th Cir. 2004) (same); *Youmans*, 626 F.3d at 562 (citation omitted) ("[O]nce a defendant raises the defense [of qualified immunity and demonstrates he was acting within his discretionary authority], the plaintiff bears the burden of establishing both that the defendant committed a constitutional violation and that the law governing the circumstances was clearly established at the time of the violation."). This court is "free to consider these elements in either sequence and to decide the case on the basis of either element that is not demonstrated." *Id.*; *Rehberg v. Paulk*, 611 F.3d 828, 839 (11th Cir. 2010) (*citing Pearson*, 555 U.S. at 241–42) (holding that the court may analyze the elements "in whatever order is deemed most appropriate for the case.").

## C.  Retaliation

Alverson complains that in January of 2018 the defendants transferred him from Draper to Easterling and refused him placement at Staton for employment at the furniture plant in retaliation for his filing other lawsuits,  Doc. 1 at 7–8, and, generally, that all transfer decisions for nine (9) years prior to filing the complaint also occurred in retaliation

for his legal activities.  Doc. 11 at 2.  In support of the allegation regarding his 2018 transfer to Easterlilng, Alverson asserts defendant Mills advised him his transfer to Easterling and lack of assignment to the furniture plant was because he had previously sued Mills.  Doc. 1 at 4.  Mills, a correctional officer who lacked the authority to effectuate a transfer decision and possessed absolutely no authority to determine the transfer destination of an inmate, denies this assertion and avers he was not in any way involved in the decision regarding the facility to which Alverson would be transferred.  Doc. 34-2 at 1.  In the voluminous evidentiary materials filed in this case, Lorenzo Mills and each of the defendants who served as staff members at Draper maintain that institutional coordinators were tasked with the responsibility of making all decisions addressing the transfer of inmates. The defendants further maintain Alverson's transfer in 2018 from Draper to Easterling occurred due to the impending closure of Draper, and, as with all decisions on whether to transfer an inmate, consideration by those officials of the inmate's custody level, medical codes, mental health codes, location of his enemies and available bed space.  Defendant Ellington, who served as Institutional Coordinator for the Northern Region, advises that the Alabama Department of Corrections was "in the process of closing Draper Correctional Facility and several inmates were moved where available beds were open at other security level four facilities."  Doc. 34-7 at 2.  Ellington also states he did not "personally order the plaintiff to be transferred from Draper to Easterling as a form of retaliation."  Doc. 34-7 at 2. Moreover, in his response to interrogatories propounded by Alverson, Ellington states he "was not the person who chose Easterling to house the Plaintiff."  Doc. 55-7 at 1.

Defendant Brittny Bates, a classification supervisor, addresses Alverson's claim challenging his 2018 transfer to Easterling, in pertinent part, as follows:

> [Due to the imminent closure of Draper Correctional Center], transfer orders were generated via [Institutional Coordinators and supplied to] Transfer Agents . . . accordingly. Due to a risk of breach in the safety and security of any given facility within [the] Alabama Department of Corrections, under no circumstances is any inmate ever apprised of a pending transfer to another facility.
>
> . . . .
>
> Inmate Alverson[] was transferred to Easterling Correctional Facility due to that facility being an approved, enemy free facility with available bed space. Inmate Alverson was transferred to Easterling Correctional Facility on January 26, 2018 along with other inmates via Transfer Agents per [orders of] Institutional Coordinators. Strict criteria was used to screen each inmate before any transport occurred to another facility. Retaliation, as stated by Inmate Alverson was not a guideline nor criteria for transfer to Easterling Correctional Facility from Draper Correctional Facility [and such transfer occurred] due to [Draper's] imminent closure.
>
> . . . . Inmate Alverson's transfer to Easterling was not a form of punishment but occurred due to the imminent closure of Draper Correctional Facility.
>
> . . . . I did not refuse the plaintiff any transfers to any other facility because of his of civil actions. . . .

Doc. 34-1 at 2–4.

Additionally, defendant Amy Davenport, another classification specialist, avers that:

> . . . [P]er the Social Service Action Form/N258 located in Inmate Alverson's file, on August 27, 2009 a Warden to Warden transfer between Draper Correctional Facility and Easterling Correctional Facility [effectuating his transfer from Easterling to Draper]. Per documentation located in Inmate Alverson's file, civil actions filed with this court were not documented as a cause for transfer. . . .

. . .  [D]ue to the imminent closure of Draper Correctional Facility, transfer of Inmate Alverson to Easterling Correctional Facility occurred on 01/26/2018.  In order for Inmate Alverson to be properly transferred to another approved facility, factors such as [security level,] Health Codes, Mental Health Codes and Enemy locations had to be verified.  Bed space at approved facilities had to be secured in order to transfer Inmate Alverson, along with several hundred other inmates, away from Draper Correctional Facility. Transfer of Inmate Alverson was coordinated between the Institutional Coordinators and Transfer Agents.

. . . .

[Contrary to the allegations of Inmate Alverson], for the past three years no conversation has transpired between inmate Alverson and Classiification Specialist Ms. Davenport concerning transfer to another facility, more specifically Easterling Correctional Facility, Staton Correctional Facility nor Limestone Correctional Facility. Any such request to transfer would be documented in writing either on the Annual Review Classification Summary documents before Inmate Alverson signed his name or through an inmate request slip. All documentation in reference to transfer would have been scanned into Inmate Alverson's [prison] file and would have given cause for a Social Service Action Form/N258 to be generated; however, [as of March 1, 2018, a search of Inmate Alverson's inmate file for a transfer request yielded] no such request. . . .  Per the ADOC Male Classification Manual, Revised January 2018, . . ., an inmate can request to transfer to another facility in order to complete a specific program or to move to a facility that is closer to home.  It should be noted that in order for an inmate to be transferred to another facility, the inmate must have resided at his current facility for at least six months and have a six month disciplinary clear record.  Also, [the inmate's] health code and mental health code may be a factor taken into consideration for approval of [a] lateral transfer.

. . . . Due to a risk of breach in the safety and security of any given facility within [the] Alabama Department of Corrections, under no circumstances is any inmate ever apprised of a pending transfer to another facility.

. . . .

. . .  [N]o . . . documentation has been received [at this time] from Inmate Alverson requesting employment at the Furniture Plant operated by [the] Alabama Department of Corrections.  Any and all requests made for employment by an inmate is thoroughly screened per criteria and scanned

into the inmate's file.  The request for employment is documented as to whether the inmate has been approved for work placement or is ineligible with a copy returned to [the] inmate.  No such request has been made per inmate's file.

. . . .

. . .  [A]ny inmate employed at Draper Correctional Facility must [meet established criteria for job placement and] continue to meet criteria in order to remain employed; however, proper procedure is [for the inmate to] provide a written request so that it can be documented. Job placements are screened through Classification Division per criteria with the head warden of Draper Correctional Facility having final approval.

. . . [T]his Classification Specialist is aware of the imminent closure of Draper Correctional Facility; however, any and all inmate transfer movement was coordinated via Institutional Coordinators and Transfer Agents.  Due to Draper Correctional Facility's imminent closure, all inmates are being screened and placed at approved facilities throughout the State as bed space becomes available.

. . . . Inmate Alverson[] was transferred to Easterling Correctional Facility due to that facility being an approved, enemy free facility with available ben space. Inmate Alverson was transferred to Easterling Correctional Facility on January 26, 2018 along with at least 9 other inmates via Transfer Agents per [orders of] Institutional Coordinators.  Strict criteria was used to screen each inmate before any transport occurred to another facility.  Retaliation, as stated by Alverson was not a guideline nor criteria for [his] transfer to Easterling Correctional Facility from Draper Correctional Facility due to imminent closure.

Doc. 34-3 at 2–5 (citations to attachment omitted); Doc. 34-2 at 1–2 (Aff. of Lorenzo Mills)

(denying any discussion with Alverson regarding this inmate's transfer to Easterling and

states he had no input with respect to such transfer because these decisions are made solely

by institutional coordinators after consideration of all relevant factors).

Defendant Mills also adamantly denies Alverson's claim of retaliation made against

him regarding any job assignment decision and maintains such adverse decision would

have been made by other correctional officials based on their  determination of whether

Alverson warranted the requested job assignment under applicable criteria.  Doc. 85-1 at

1−2.  Specifically, in this affidavit, Mills states that

> . . . denial or refusal to place inmate Alverson at the Furniture Plant located at and/or near Draper Correctional facility was not due to knowledge of any pending or filed civil actions. . . .

> . . . [I]nmate Alverson would have to request placement at [the] Furniture Plant [through a request slip].  The request slip[] would then come to classification, where a . . . check list would have to be completed  showing eligibility [of the applicant].  That checklist would either be cleared with a "yes" or "no" recommendation and sent to the Warden for final approval. After this final check, the checklist and [a] copy of [the] request slip would be scanned into the Laserfiche file.  The original request would then be returned to the inmate stating yes or no with reason.  A copy of the request slip and checklist would then be forwarded to ICS where I could place the inmate in the job board module for the whole process to be done electronically.

Doc. 85-1 at 1−2.  Defendant Davenport also avers that "[r]etaliation for any pending or

filed civil actions, as stated by Inmate Alverson[,] was not a guideline nor criteria for job

placement at Draper Correctional Facility."  Doc. 78-2 at 2   The defendants further assert

no requisite request slip is contained in Alverson's institutional file regarding a request for

assignment to the furniture plant near the time of his transfer to Eastlering in January of

2018 and the evidentiary materials submitted in this case support this assertion.

To the extent Alverson seeks to hold the defendants liable for decisions made by

other correctional officials regarding any transfer decision, including his transfer from

Draper to Easterling in January of 2018, and his lack of assignment to the furniture plant,

he cannot do so as the law is well-settled that state officials "are not liable under § 1983

for the unconstitutional acts of their subordinates on the basis of respondeat superior or

vicarious liability." *Cottone v. Jenne*, 326 F.3d 1352, 1360 (11th Cir. 2003); *Gonzalez v. Reno*, 325 F.3d 1228, 1234 (11th Cir. 2003) (concluding officials are not liable on the basis of respondeat superior or vicarious liability); *Hartley v. Parnell*, 193 F.3d 1263, 1269 (11th Cir. 1999), citing *Belcher v. City of Foley*, 30 F.3d 1390, 1396 (11th Cir. 1994) (42 U.S.C. § 1983 does not allow a plaintiff to hold an official liable for the actions of others under either a theory of respondeat superior or vicarious liability.). "[E]ach Government official, his or her title notwithstanding, is only liable for his or her own misconduct." *Ashcroft v. Iqbal*, 556 U.S. 662, 677 (2009).

Insofar as any defendant may have been personally involved in determining the facility within which to house Alverson, including the decision regarding Alverson's transfer to Easterling in 2018, and his lack of assignment to employment at the furniture plant, federal law recognizes "that 'courts are ill equipped to deal with the increasingly urgent problems of prison administration and reform.' [*Procunier v. Martinez*, 416 U.S. 396, 405, 94 S.Ct. 1800, 1807 (1974)].   As the *Martinez* Court acknowledged, 'the problems of prisons in America are complex and intractable, and, more to the point, they are not readily susceptible of resolution by decree.' *Id.*, at 404–05, 94 S.Ct., at 1807. Running a prison is an inordinately difficult undertaking that requires expertise, planning, and the commitment of resources." *Turner v. Safley*, 482 U.S. 78, 84–85 (1987).   "The first amendment prohibits state officials from retaliating against prisoners for exercising their right of free speech. *See, e.g., Wright v. Newsome*, [795 F.2d 964, 968 (11th Cir. 1986)]. . . .   The gist of a retaliation claim is that a prisoner is penalized for exercising a right of free speech." *Thomas v. Evans*, 880 F.2d 1235, 1241–42 (11th Cir. 1989); *Farrow*

*v. West*, 320 F.3d 1235, 1248 (11th Cir. 2003). The situation is clearly complicated when the alleged act of retaliation regards a housing or work assignment as an inmate may attempt to inappropriately influence decisions regarding such actions "by drawing the shield of retaliation around them." *Woods v. Smith*, 60 F.3d 1161, 1166 (5th Cir. 1995), *cert. denied* sub nom *Palermo v. Woods*, 516 U.S. 1084, 116 S.Ct. 800, 133 L.Ed.2d 747 (1996).

It is essential that federal courts "carefully scrutinize retaliation claims" brought by prisoners challenging the constitutionality of actions of correctional personnel. *Woods v. Smith*, 60 F.3d 1161, 1166 (5th Cir. 1995), *cert. denied* sub nom *Palermo v. Woods*, 516 U.S. 1084, 116 S.Ct. 800, 133 L.Ed.2d 747 (1996). "[C]ourts must approach prisoner claims of retaliation with skepticism and particular care. *See Flaherty v. Coughlin*, 713 F.2d 10, 13 (2nd Cir. 1983). This is [necessary because prisoners'] . . . claims of retaliation are . . . easily fabricated [and] pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration. This is so because virtually any adverse action taken against a prisoner by a prison official—even those otherwise not rising to the level of a constitutional violation—can be characterized [by the prisoner] as a constitutionally proscribed retaliatory act." *Dawes v. Walker*, 239 F.3d 489, 491 (2nd Cir. 2001), *overruled on other grounds*, *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002).

To proceed on claims of retaliation and withstand the entry of summary judgment, an "inmate must establish . . . three elements: (1) his speech was constitutionally protected; (2) the inmate suffered adverse action such that the [defendants'] allegedly retaliatory conduct would likely deter a person of ordinary firmness from engaging in such speech;

and (3) there is a causal relationship between the retaliatory action and the protected speech. *See Bennett v. Hendrix*, 423 F.3d 1247, 1250, 1254 (11th Cir. 2005)." *Smith v. Mosley*, 532 F.3d 1270, 1276 (11th Cir. 2008); *Thaddeus-X v. Blatter*, 175 F.3d 378, 397 (6th Cir. 1999). With respect to the causal relationship element, a prisoner must demonstrate that correctional officials intended to retaliate for his exercise of a right protected under the First Amendment and, but for the retaliatory motive, the adverse act complained of would not have occurred. *Woods*, 60 F.3d at 1166; *Smith*, 532 F.3d at 1278.

An inmate has the initial burden of establishing a prima facie case of unlawful retaliation by showing "that his conduct was constitutionally protected and that this conduct . . . was a 'motivating factor'" behind the challenged action of the defendant. *Mt. Healthy City School District Bd. of Education v. Doyle*, 429 U.S. 274, 287 (1977). Merely alleging the ultimate fact of retaliation, however, is insufficient. *Cain v. Lane*, 857 F.2d 1139, 1142, n.6 (7th Cir. 1988); *Woods*, 60 F.3d at 1166. Additionally, conclusory allegations are insufficient to demonstrate the existence of each element requisite to establishing retaliation. *Morales*, 278 F.3d at 131; *Bennett v. Goord*, 343 F.3d 133, 137 (2nd Cir. 2003) (Because prisoner retaliation claims are prone to abuse, "we are careful to require non-conclusory allegations."). If an inmate meets his burden with appropriate evidence, the burden of production shifts to the defendant to show that he "would have reached the same decision as to [the challenged action] even in the absence of the protected conduct." *Mt. Healthy*, 429 U.S. at 287. "Under the *Mt. Healthy* approach, if the government official 'can prove that [he or she] would have taken the adverse action in the

absence of the plaintiff's protected conduct, [they] cannot be held liable.' *Thaddeus-X*, 175 F.3d at 388 n.4." *Smith*, 532 F.3d at 1278 n.22.

Alverson alleges his transfer to Easterling in January of 2018 instead of Staton, the denial of employment at the furniture plant adjacent to Staton, and other prior decisions on his place of incarceration occurred due to his filing previous lawsuits, thus satisfying the first element of his retaliation claims, i.e., his exercise of a protected right. *Smith*, 532 F.3d at 1277. The second element requires Alverson to demonstrate that he, in fact, suffered adverse actions — confinement in or transfer to a less desirable facility and lack of employment at the furniture plant — and these actions "would likely deter a [prisoner] of ordinary firmness" from filing legal actions challenging the constitutionality of a transfer. *Id*. This "presents an objective standard and a factual inquiry." *Id*. There is nothing before this court which indicates that those persons actually involved in the decision-making process regarding transfers of inmates relied on Alverson's litigation history in determining his place of incarceration or that his litigation history played any role in his lack of employment at the furniture plant. Instead, decisions as to where Alverson would be incarcerated, including the decision to transfer him to Easterling in 2018, occurred due to the chosen facility being one appropriate for his classification level, free of any enemies and having available bed space at the relevant time. As for employment at the furniture plant, the named defendants had no proper request from Alverson seeking such employment at the time relevant to the complaint. Additionally, it does not appear to the undersigned that the actions challenged as retaliatory would deter an ordinary inmate from filing lawsuits and, in the experience of this court, the very opposite is true. For instance,

the records of this court establish that Alverson was not in any way deterred in his legal pursuits.  Even if this standard had been met, Alverson fails to satisfy the third requisite element of a retaliation claim, a causal connection between his constitutionally protected activity and the alleged adverse actions. i.e., the lack of some previously requested transfer or his 2018 transfer to Easterling and concomitant denial of placement at Staton for employment in the furniture plant.

The causal connection inquiry focuses on the "subjective motivation of the defendant[,]" *Thaddeus-X*, 175 F.3d at 399, and this court will therefore address "whether the defendants were subjectively motivated to" take any action regarding Alverson, including decisions as to his place of incarceration and employment at the furniture plant, for filing prior lawsuits.  *Smith*, 532 F.3d at 1278.  The subjective motivation issue is resolved by most courts under the burden-shifting formula set forth in *Mt. Healthy*.  This formula requires that the plaintiff first meet "his burden of establishing that his protected conduct was a motivating factor behind any harm" — an element the court assumes *arguendo* exists — and then "the burden of production shifts to the defendant.  If the defendant can show that he would have taken the same action [or lack of action] in the absence of the protected activity, he is entitled to prevail on summary judgment." *Thaddeus-X*, 175 F.3d at 399, referencing *Mt. Healthy* motive analysis.

The defendants deny the allegations of retaliation made by Alverson and maintain the decision to transfer Alverson to Easterling in 2018 transpired because of the imminent closure of Draper and, as with any transfer decision, the determination by institutional coordinators that the facility chosen for transfer of the inmate constituted an appropriate

facility to house Alverson based on his classification level, enemy-free status at this facility and available bed space.  Doc. 34-1 at 3; Doc. 34-3 at 2; Doc. 34-4 at 1−2; & Doc. 78-1 at 2.  They also maintain Alverson did not submit the appropriate documentation requesting assignment to the furniture plant at the time made the subject of the instant complaint.  Doc. 34-3 at 3–4 & Doc. 78-1 at 4.  In an effort to contradict this contention, Alverson directs the court's attention to a handwritten request he submitted to Warden John Crow, an individual not a defendant in this case, on May 13, 2014 seeking employment at either the State garage or furniture plant.  Doc. 67-3.  Alverson references prior requests made to Warden Crow that Crow denied because there were "no openings."  Doc. 67-3.  Warden Crow, however, denied this request made in May of 2014 for the specific reason that Alverson did not qualify for such assignment at that time because  he was not within the requisite period of time "to [his] earliest possible release date."  Doc. 67-3.  Thus, the request submitted by Alverson to Warden Crow in 2014 does not support his claim of retaliation and, instead, undermines such claim.[2]

Alverson offers his conclusory allegation of ultimate fact that the defendants retaliated against him for filing prior lawsuits.  This allegation is insufficient to defeat summary judgment.  *Waddell*, 276 F.3d at 1279; *Holifield*, 115 F.3d at 1564, n.6.  The

---

[2]Furthermore, because tolling of the limitations period is not warranted under the facts of this case, *see Ala. Code* § 6-2-8(a), any claim arising from an alleged retaliatory act which occurred more than two years prior to the filing of this complaint is barred by the applicable statute of limitations.  *McNair v. Allen*, 515 F.3d 1168, 1173 (11th Cir. 2008) (holding that "[a]ll constitutional claims brought under § 1983 are tort actions, subject to the statute of limitations governing personal injury actions in the state where the § 1983 action has been brought.  *Wilson v. Garcia*, 471 U.S. 261, 275–76, 105 S.Ct. 1938, 1946–47, 85 L.Ed.2d 254 (1985).  [The plaintiff's] claim was brought in Alabama where the governing limitations period is two years.  Ala. Code § 6-2-38; *Jones v. Preuit & Mauldin*, 876 F.2d 1480, 1483 (11th Cir. 1989) (en banc).").

record contains no evidence that any adverse decision by a person actually responsible for such decision occurred due to Alverson filing lawsuits from which a reasonable fact-finder could infer the requisite motivating factor as to the alleged acts of retaliation. Additionally, the circumstances, when taken as a whole, do not support making such an inference. Thus, the retaliation claims likewise falter on this element as the defendants have shown no decision regarding the housing of Alverson, including the determination to transfer him to Easterling in January of 2018, or his lack of assignment to the furniture plant were in any way impacted by his filing lawsuits. In light of the foregoing, the defendants are entitled to summary judgment on the claims of retaliation presented by Alverson.

### D.  Equal Protection

Alverson makes a purely conclusory allegation that his transfer to Easterling deprived him of equal protection. Doc. 1 at 8. This claim provides Alverson no basis for relief because merely alleging a violation of equal protection fails to state a claim on which relief may be granted. *See Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

"Despite the tendency of all rights 'to declare themselves absolute to their logical extreme,' there are obviously limits beyond which the equal protection analysis may not be pressed. . . .  The Fourteenth Amendment 'does not require absolute equality or precisely equal advantages,'. . . nor does it require the State to 'equalize [prison] conditions.'" *Ross v. Moffitt*, 417 U.S. 600, 611-612 (1974); *Hammond v. Auburn University*, 669 F.Supp. 1555, 1563 (M.D.Ala. 1987) ("The Equal Protection Clause of the Fourteenth Amendment does not require all persons to be treated either identically or equally."). In order to present a claim of discrimination cognizable under the Equal Protection Clause, "a prisoner must

[at a minimum] demonstrate that (1) he is similarly situated to other prisoners who received more favorable treatment; and (2) the state engaged in invidious discrimination against him based on race, religion, national origin, or some other constitutionally protected basis. *Jones v. Ray*, 279 F.3d 944, 946-47 (11th Cir. 2001); *Damiano v. Florida Parole and Prob. Comm'n*, 785 F.2d 929, 932-33 (11th Cir. 1986)."  *Sweet v. Secretary, Department of Corrections*, 467 F.3d 1311, 1318-19 (11th Cir. 2006).  "[O]fficial action will not be held unconstitutional solely because it results in a . . . disproportionate impact. . . .  Proof of . . . discriminatory intent or purpose is required to show a violation of the Equal Protection Clause."  *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 264-265 (1977).  "'Discriminatory purpose' . . . implies more than intent as volition or intent as awareness of consequences.  It implies that the decision maker . . . selected . . . a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group."  *Personnel Administrator of Massachusetts v. Feeney*, 442 U.S. 256, 279 (1979) (footnote and citation omitted); *see also Hernandez v. New York*, 500 U.S. 352, 359 (1991).  Evidence which merely indicates disparity of treatment or even arbitrary administration of state powers, rather than instances of purposeful or invidious discrimination, is insufficient to show discriminatory intent. *McKleskey v. Kemp*, 481 U.S. 279, 292 (1987).

Alverson fails to identify any similarly situated inmate who received differential favorable treatment.  Thus, Alverson's "equal protection claim necessarily fails first because he has not [asserted] that he was treated differently from other, similarly situated

prisoners." *Sweet*, 467 F.3d at 1319.  The undersigned further finds this claim provides no

basis for relief

> because [Alverson] has not alleged . . . that he was treated differently on
> account of some form of ***invidious discrimination*** tied to a constitutionally
> protected interest.  He has not even claimed that he was treated differently
> from others because of race, religion, or national origin.  *See Snowden v.
> Hughes*, 321 U.S. 1, 8, 64 S.Ct. 397, 88 L.Ed. 497 (1944) ("The unlawful
> administration . . . of a state statute fair on its face, resulting in its     unequal
> application to those who are entitled to be treated alike, is not a denial of
> equal protection unless there is shown to be present in it an element of
> intentional or purposeful discrimination."); *McQueary v. Blodgett*, 924 F.2d
> 829, 835 (9th Cir.1991) (rejecting a claim that a state prisoner's equal
> protection rights were violated because he received a longer sentence than
> some other prisoners and holding that "a mere demonstration of inequality is
> not enough; the Constitution does not require ***identical*** treatment.  There
> must be an allegation of invidiousness or illegitimacy in the statutory scheme
> before a cognizable claim arises:  it is a settled rule that the Fourteenth
> Amendment guarantees equal laws, not equal results."  (internal quotation
> marks omitted)); *see also Cruz v. Skelton*, 543 F.2d 86, 92-93 (5th Cir.1976)
> (affirming dismissal of prisoner's equal protection claim because there was
> no allegation of "'invidious discrimination' based on such considerations as
> race, religion, national origin, or poverty").

*Sweet*, 467 F.3d at 1319 (emphasis in original).  The record before the court contains no

evidence of any discrimination in the decision to transfer Alverson to Easterling.

Consequently, the conclusory allegation of an equal protection violation entitles Alverson

to no relief.

Moreover, it is clear from the record before the court that those correctional officials

actually tasked with deciding where to transfer Alverson based their decision to transfer

him to Easterling on non-discriminatory reasons such as his custody level, medical status,

mental health code, location of enemies and available bed space.

The record contains no evidence which would be admissible at trial that the defendants named herein, or any other correctional official for that matter, acted due to purposeful discrimination.  Under applicable federal law, the allegations made by Alverson are insufficient to show an equal protection violation and summary judgement is due to be granted in favor of the defendants on this claim.

### E.  Due Process

Insofar as Alverson complains that his transfer to Easterling rather than a facility of his choosing deprived him of due process, Doc. 1 at 8, he is likewise entitled to no relief. The law is well-settled that a convicted prisoner has no constitutionally protected right to confinement in a particular penal facility. *Meachum v. Fano*, 427 U.S. 215, 224 (1976). Thus, an inmate may be confined in any correctional facility without implicating the prisoner's constitutional rights. Id. Although Alverson's confinement at Easterling may have entailed "more burdensome conditions" than that of another facility, such confinement is " 'within the normal limits or range of custody which the conviction has authorized the State to impose.' [*Meachum*, 427 U.S. at 225]; *see also Montanye v. Haymes*, 427 U.S. 236, 242, 96 S.Ct. 2543, 2547, 49 L.Ed.2d 466 (1976)." *Sandin v. Conner*, 515 U.S. 472, 478 (1995).  As such, the failure to transfer Alverson to a correctional facility of his choosing does not rise to the level of a constitutional violation and such claim therefore provides no basis for relief in this 42 U.S.C. § 1983 action.

### F.  Conspiracy

Alverson alleges the defendants conspired to have him transferred to Easterling in retaliation for his legal activities.  Doc. 11 at 2.  The defendants deny engaging in a

conspiracy against Alverson.  To proceed on a conspiracy claim under 42 U.S.C. § 1983, "a plaintiff must show that the parties reached an understanding to deny the plaintiff his or her rights [and] prove an actionable wrong to support the conspiracy. . . .  [T]he linchpin for conspiracy is agreement[]." *Bailey v. Board of County Comm'rs of Alachua County*, 956 F.2d 1112, 1122 (11th Cir.), *cert. denied*, 506 U.S. 832 (1992) (internal quotation marks and citation omitted).  In order for a plaintiff "to establish the understanding or willful participation required to show a conspiracy, . . . [he] must [produce] some evidence of agreement between the defendants[.]" *Rowe v. City of Fort Lauderdale*, 279 F.3d 1271, 1283–84 (11th 2002) (internal quotation marks omitted).  Merely "stringing together" acts of individuals is insufficient to demonstrate the existence of a conspiracy. *Harvey v. Harvey*, 949 F.2d 1127, 1133 (11th Cir. 1992); *Fullman v. Graddick*, 739 F.2d 553, 556–57 (11th Cir. 1984) (holding that a vague and conclusory allegation of a conspiracy fails to state a claim upon which relief can be granted).

Other than his suppositious and conclusory allegation of a conspiracy, Alverson presents nothing which suggests the existence of an actual conspiracy nor can this court countenance the existence of any evidence which would indicate that the defendants entered into a conspiracy to deprive Alverson of his constitutional rights.  In addition, the court has found no violations of Alverson's constitutional rights with respect to the manner in which correctional officials handled his transfer from Draper to Easterling.  Thus, the allegation of a conspiracy presented by Alverson is insufficient to support a claim for relief in this 42 U.S.C. § 1983 action. *Harvey*, 949 F.2d at 1133; *Fullman*, 739 F.2d at 556–57.

## G.  Disposition of Claims

Since the undersigned finds the defendants did not act in violation of Alverson's constitutional rights, they are entitled to qualified immunity from the request for monetary damages made against them in their individual capacities.  Moreover, due to the lack of any violation of Alverson's constitutional rights, he is likewise due no other relief from the defendants in either their individual or official capacities.  Summary judgment is therefore due to be granted in favor of the defendants on the claims presented by Alverson alleging violations of his constitutional rights.

## IV.  CONCLUSION

Accordingly, it is the RECOMMENDATION of the Magistrate Judge that:

1.      The defendants' motion for summary judgment be GRANTED.

2.      Judgment be GRANTED in favor of the defendants.

3.      This case be DISMISSED with prejudice.

4.      Costs be taxed against the plaintiff.

On or before **February 3, 2021** the parties may file objections to this Recommendation.  A party must specifically identify the factual findings and legal conclusions in the Recommendation to which the objection is made; frivolous, conclusive, or general objections will not be considered.

Failure to file written objections to the proposed findings and legal conclusions set forth in the Recommendations of the Magistrate Judge shall bar a party from a *de novo* determination by the District Court of these factual findings and legal conclusions and shall "waive the right to challenge on appeal the District Court's order based on unobjected-to

factual and legal conclusions" except upon grounds of plain error if necessary in the interests of justice.  11TH Cir. R. 3-1; *see Resolution Trust Co. v. Hallmark Builders, Inc.*, 996 F.2d 1144, 1149 (11th Cir. 1993) ("When the magistrate provides such notice and a party still fails to object to the findings of fact and those findings are adopted by the district court the party may not challenge them on appeal in the absence of plain error or manifest injustice."); *Henley v. Johnson*, 885 F.2d 790, 794 (11th Cir. 1989).

DONE this 20th day of January, 2021.

_____/s/ Charles S. Coody_____
UNITED STATES MAGISTRATE JUDGE